# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| MILWAUKEE ELECTRIC TOOL CORPORATION, METCO BATTERY TECHNOLOGIES LLC, AC (MACAO COMMERCIAL OFFSHORE) LIMITED, and TECHTRONIC INDUSTRIES CO. LTD., <br><br> Plaintiffs, <br><br> v. <br><br> CHERVON NORTH AMERICA INC., <br><br> Defendant. | Case No. 14-CV-1289-JPS <br><br><br><br> **ORDER** |

Defendant Chervon North America Inc. ("Chervon") filed a motion to compel discovery responses on April 7, 2017. (Docket #171). In its motion, Chervon contends that Plaintiffs' assertions of attorney-client privilege as to certain documents should be pierced because Plaintiffs engaged in fraud on the U.S. Patent and Trademark Office. Plaintiffs oppose the motion, arguing that their representations to the Patent Office have always been candid and truthful. Chervon's motion is fully briefed and, for the reasons stated herein, the Court will deny the motion.

1.  BACKGROUND

The relevant facts can be briefly summarized. Chervon claims that Plaintiffs obtained the patents-in-suit by withholding or misrepresenting material information to the Patent Office in two declarations submitted by Gary Meyer ("Meyer"), a named inventor for each of the patents-in-suit and former Director of Advanced Engineering Technology at Plaintiff Milwaukee Electric Tool Corporation. First, in 2007, Meyer submitted an

affidavit to the Patent Office in connection with U.S. Application No. 10/721,800 ("the '800 Application"), the parent application for the subject patents. The affidavit was submitted to combat the patent examiner's view that using lithium-based batteries in corded power tool applications was obvious. In it, Meyer averred that "[t]he conventional view in the industry was that one alternative battery chemistry, lithium, was too unstable for use in corded tool applications." (Docket #173-4 ¶ 6). Plaintiffs claimed that their lithium battery packs solved this problem. *Id.* In light of this declaration and the other materials Plaintiffs submitted, the patent examiner allowed the patent to issue. According to Chervon, contrary to his assertions in the 2007 declaration, Meyer admitted during his deposition in this case that as early as 1999, he predicted that it was a "matter of time" before the industry embraced lithium technology for power tools. (Docket #173-8 50:15–51:14).

A similar event unfolded in 2009 in connection with the application for one of the patents-in-suit. Meyer submitted another affidavit and in it, he revealed for the first time that in 2001 he had received two lithium-ion battery backs from a representative of a Canadian firm, E-One Moli Energy (Canada) Ltd. ("Moli"). The plastic battery packs contained rechargeable lithium-ion rechargeable cells and were designed for use with power tools. Meyer averred that he had tested Moli's battery packs in late 2001 and found them insufficient to meet certain benchmarks. For instance, he claimed that they could not sustain a 20-amp discharge current for longer than one minute without a drop-off in voltage, rendering the packs unacceptable for use with power tools. Likewise,

Meyer said that the battery packs failed a test wherein they were used in a circular saw to make repeated cuts because they overheated and could not deliver their claimed amp rating over the entire rated capacity of the battery.[1] Chervon alleges that Meyer's testing and averments helped convince the Patent Office that the Moli packs were failures, thus bolstering Plaintiffs' own application.

His representations are contradicted, in Chervon's view, by several of Meyer's statements, including: (1) his admission at his deposition that those packs could sustain 20 amps of continuous discharge for over three minutes without a voltage drop-off; (2) his admission during his deposition that the packs delivered an average discharge current of 26.19 amps during over 30 cuts with a circular saw; (3) his admission during his deposition that the circular-saw application can be "the most demanding on a battery pack," (Docket #173-8 255:25–257:11), and that Moli's battery worked better in less-demanding applications such as drilling; (4) his admission in his deposition that the initial voltage depression that occurred at the beginning of cutting was commonplace and could be compensated for with a control circuit; (5) his statement in an October 2001 email to his coworkers that the packs "ran some of [Plaintiffs'] tools

---

[1]One of the central disputes in this case concerns the "20-amp limitation" in the patents-in-suit. This limitation requires that the battery cells "[be] capable of producing an average discharge current greater than or equal to approximately 20 amps." Plaintiffs claim that to meet this limitation, the battery pack must produce reasonably close 20 or more amps during its entire rated capacity when used continuously. Chervon, by contrast, contends that the battery pack should be held to meet the limitation when it can produce an average of over 20 amps during short periods of intermittent use over the battery's entire rated capacity. This dispute will be not be resolved here but it features into the resolution of the present motion, as discussed further below.

OK," (Docket #173-13); and (6) another statement in a November 2001 email to a colleague that the packs "perform[ed] outstanding—even in our toughest application, the circular saw," (Docket #173-14).

Further, says Chervon, Meyer knew that Moli had developed battery cells with greater amp capabilities than the packs he tested, yet he did not disclose this to the Patent Office in connection with the applications underlying the patents-in-suit. Finally, although Meyer characterized the Moli battery packs as failures in 2009 because of overheating, Plaintiffs represented to the Court in their prior summary-judgment briefing that a battery pack can meet the 20-amp discharge requirement "regardless of what tool is used, regardless of what application is performed, [and] regardless of the temperature during discharge." (Docket #82 at 5).

Plaintiffs withheld some documents otherwise responsive to Chervon's document requests. Plaintiffs prepared a privilege log identifying the documents it withheld. Forty-nine such documents are drafts of Meyer's 2007 and 2009 declarations or are related communications about the declarations. Plaintiffs asserted the attorney-client privilege as their basis for withholding these documents. Chervon now seeks an order from the Court directing Plaintiffs to turn them over.[2]

---

[2]Chervon's allegations in this motion also form the basis for several of its affirmative defenses, which claim that Plaintiffs' patents are unenforceable because Plaintiffs have engaged in inequitable conduct—that is, concealing the Moli packs and their capabilities from the Patent Office. *See* (Docket #143).

**2. DISCUSSION**

The attorney-client privilege is one of the oldest recognized privileges in the common law. *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). Piercing it is not undertaken lightly. However, it can be done if the moving party can show that the communications were made in furtherance of a crime or fraud. *United States v. Zolin*, 491 U.S. 554, 563 (1989). In the context of alleged fraud on the Patent Office, the Federal Circuit[3] has held that "[a] party must establish *Walker Process* fraud, also known as common law fraud, to successfully pierce the attorney-client privilege under the crime-fraud exception." *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1358 (citing *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965)).[4] This requires that the moving party make a *prima facie* showing as to the following elements: "(1) a representation of material fact, (2) the falsity of that representation, (3) the intent to deceive or, at least, a state of mind so reckless as to the

---

[3]The Federal Circuit's precedent controls in this instance over that of the Seventh Circuit. *In re Spalding Worldwide, Inc.*, 203 F.3d 800, 804 (Fed. Cir. 2000).

[4]Chervon suggests that a *prima facie* case of inequitable conduct would also suffice to permit piercing the privilege. (Docket #172 at 19); (Docket #188 at 7). But while the Federal Circuit noted in *Therasense* that establishing inequitable conduct "may also prove the crime or fraud exception to the attorney-client privilege," the case it cited, *Spalding*, was careful to observe that "inequitable conduct is not by itself common law fraud," and that common-law fraud is what is required for piercing the privilege. *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1289 (Fed. Cir. 2011) (en banc); *Spalding*, 203 F.3d at 807; *see also Avnet, Inc. v. Motio, Inc.*, Case No. 12 C 2100, 2015 WL 5474435, at *3–4 (N.D. Ill. Sept. 16, 2015) (explaining significant differences between standards applicable to crime-fraud exception and inequitable conduct defense).

Page 5 of 14

Case 2:14-cv-01289-JPS   Filed 05/26/17   Page 5 of 14   Document 199

consequences that it is held to the equivalent of intent (scienter), (4) a justifiable reliance upon the misrepresentation by the party deceived which induces him to act thereon, and (5) injury to the party deceived as a result of his reliance on the misrepresentation." *In re Spalding Sports Worldwide, Inc.*, 203 F.3d 800, 807 (Fed. Cir. 2000). The Court of Appeals has said that "making a *prima facie* showing is 'not a particularly heavy' burden," *Micron Technology, Inc. v. Rambus, Inc.*, 645 F.3d 1311, 1330 (Fed. Cir. 2011) (quoting *In re Grand Jury Investigation*, 445 F.3d 266, 274–75 (3d Cir. 2006)), but has also held that the movant must come forward with "'independent and clear evidence of deceptive intent together with a clear showing of reliance'" in order to warrant the "extreme remedy of piercing the attorney-client privilege." *Unigene*, 655 F.3d at 1358–59 (quoting *Spalding*, 203 F.3d at 803).[5]

Chervon's presentation falls short of meeting its burden to establish the that crime-fraud exception applies here. Put simply, while Meyer may have stated his case strongly to the Patent Office, there is insufficient evidence to conclude that he actually misrepresented facts or intended to deceive the patent examiners. Because the evidence on these issues is sharply disputed, the Court cannot conclude that the crime-fraud exception applies. *See In re Feldberg*, 862 F.2d 622, 625–26 (7th Cir. 1988)

---

[5]To the extent there is some disconnect between these two descriptions of the applicable standard, the Court follows *Unigene*. First, it is a more recent decision than *Micron*. Second, *Unigene* cited prior Federal Circuit precedent for its view of the pertinent standard, whereas *Micron* relied on a case from the Third Circuit. Finally, *Unigene*'s presentation of the relevant authorities appears to this Court to be more comprehensive and thorough than *Micron*'s brief explanation.

(holding that the crime-fraud exception must be established by a preponderance of the evidence).

A brief examination of each of Chervon's contentions will explain this result. Chervon complains that the following represent fraudulent statements or omissions respecting the Patent Office: (1) Meyer's 2007 statement that the industry believed that lithium batteries were too unstable for use in power tools; (2) Meyer's failure to disclose the 2001 Moli battery packs and his testing thereon in connection with the '800 Application; and (3) Meyer's representation in 2009 that the Moli packs failed the discharge and cutting tests he performed. None of these feature the level of falsity or deceptive intent necessary to sustain a claim of fraud.

First, with respect to the 2007 declaration, the Court finds no fault in Meyer's statement that the industry was, as a whole, of the view that lithium batteries were too unstable for wide application. True enough, Meyer said in his deposition that he predicted a move toward lithium as early as 1999, but Meyer's and his colleagues' beliefs about industry trends and technological development are not facts. Thus, Chervon places more weight on his deposition testimony than it can bear. At worst, Meyer's knowledge of and optimism about the Moli battery packs might support an inference that he omitted some contextual information from his 2007 declaration. *See In re Method of Processing Ethanol Byproducts & Related Subsystems ('858) Patent Litig.*, Master Case Nos. 1:10–ml–02181–LJM–DML, 2014 WL 2938183, at *6 (S.D. Ind. June 30, 2014). But the possibility of such an inference is not enough to meet Chervon's burden.

Second, the Court finds unavailing Chervon's assertion that Meyer fraudulently failed to disclose the Moli battery packs during the '800 Application. Plaintiffs explain that while the Moli packs could handle a combined voltage of 21 volts, the '800 Application concerned 28-volt packs and the 20-amp limitation. At the time, it seems that Plaintiffs did not perceive enough similarity between the two to warrant disclosure. Moreover, according to Plaintiffs, the patents-in-suit are far more similar to the Moli battery packs, and they fully disclosed all of Meyer's testing in connection with their prosecutions of these patents. Chervon responds that Plaintiffs' view was unreasonable because the Moli packs and the '800 Application each concerned a plurality of 4.20-volt lithium-based battery cells in a plastic housing. Additionally, some of the claims in the '800 Application had a 20-amp limitation, and the 7-volt difference between the two could have been made up by adding two more battery cells in the series. Thus, in Chervon's opinion, the Moli packs would have rendered claim 1 of the '800 Application obvious. *See* (Docket #188 at 9–11). Chervon infers that Plaintiffs concealed their existence to avoid this undesirable result.

The Court cannot conclude, on the disputed facts presently before it, that Plaintiffs engaged in fraud by failing to disclose the Moli testing earlier. Whether or not Chervon has the better interpretation of the facts, there is no evidence establishing that Plaintiffs were under an obligation to disclose the Moli packs or that Meyer failed to do so with the intent to deceive. *See Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1071 (Fed. Cir. 1998) (mere failure to cite a reference in an application, without

Page 8 of 14

Case 2:14-cv-01289-JPS   Filed 05/26/17   Page 8 of 14   Document 199

evidence of fraudulent intent, is insufficient to establish *Walker Process* fraud). Nor is invocation of the crime-fraud exception a back-door route to claim construction or a merits ruling. As a result, the Court cannot resolve these disputes in order to decide whether Plaintiffs deceived the Patent Office.

The same reasoning undermines Chervon's claim that Meyer deliberately misrepresented the results of his testing to the Patent Office in his 2009 declaration. As to the discharge test, Chervon says that because the Moli packs delivered an average discharge current of 26.19 amps during over thirty cuts with a circular saw, and because they could sustain 20 amps of continuous discharge current for over three minutes, they should have been held to have passed. Plaintiffs disagree, arguing that (1) the pack had to be allowed to dangerously overheat to produce that result and (2) the test concerns whether the pack can consistently produce the required amperage during continuous use over its entire rated capacity, not just on average. *See Milwaukee Elec. Tool Corp. v. Hitachi Koki Co., Ltd.*, No. 09–C–948, 2012 WL 10161527, at *4 (E.D. Wis. Dec. 11, 2012) (adopting Plaintiffs' construction of the 20-amp limitation); *see supra* note 1.[6] So too with the cutting test: Chervon asserts that Plaintiffs put the pack through extreme conditions and overemphasized the initial voltage drop-off, while Plaintiffs respond that the packs did not adequately deliver throughout

---

[6]This explanation also shows why Plaintiffs did not disclose Moli's later-developed, higher amperage packs. As Plaintiffs explain, those battery packs, although denominated with higher amp ratings, were deficient like their predecessor inasmuch as they could not deliver that amp rating over their entire rated capacity. (Docket #183 at 18–19).

Case 2:14-cv-01289-JPS   Filed 05/26/17   Page 9 of 14   Document 199

their entire rated capacity and that the results Meyer was able to achieve required allowing the batteries to get dangerously hot.

Again, the parties' fact-intensive disagreements about Moli packs' performance make it difficult to conclude that Plaintiffs' representations to the Patent Office were fraudulent. *Berry Plastics Corp. v. Intertape Polymer Corp.*, No. 3:10–cv–76–RLY–WGH, 2014 WL 840952, at *2 (S.D. Ind. Mar. 3, 2014) (finding that because "[t]he facts concerning fraud are strongly contested," the plaintiff "ha[d] not presented the lofty showing necessary to. . .pierce the attorney-client privilege").[7] And it is important to remember that the Patent Office was free to measure Meyer's claims against the actual test results, which were disclosed at that time. (Docket #183 at 22–23). This leaves Chervon hard-pressed to show that the Patent Office relied on Meyer's misrepresentations, assuming there were any.[8]

---

[7]Equally unconvincing is Chervon's suggestion that Meyer's statements are inconsistent with representations Plaintiffs have made to this Court. Plaintiffs said in their prior summary-judgment briefing that a battery pack can meet the 20-amp discharge requirement "regardless of what tool is used, regardless of what application is performed, [and] regardless of the temperature during discharge." (Docket #82 at 5). Chervon believes this is inconsistent with Meyer's statement that the Moli packs failed the cutting test because of overheating. But Plaintiffs were highlighting that the 20-amp limitation requires consistent 20-amp output over the entire rated capacity of the battery, (Docket #183 at 20 n.11), so the statement is taken out of context. Moreover, the Court is not inclined to closely police counsel's advocacy, even if it is ultimately mistaken. *See Apotex*, 507 F.3d at 1362 (affirming rejection of crime-fraud exception where the statements in question were "simply attorney argument as to the inferences to be drawn from the evidence, and [] falsity was not shown").

[8]In its reply, Chervon for the first time references an additional email sent by Meyer to a colleague regarding a final cutting test he performed before sending the Moli packs back to their creator. (Docket #188 at 16–17). Meyer reported that he was able to make between 70–80 cuts with a circular saw, with a

Likewise, Meyer's optimistic emails do not contravene his 2009 averments about the test results. In the emails Chervon cites, Meyer expresses both hopefulness about the Moli batteries as well as some reserve about their functionality. Viewing those communications as a whole, there is no indication that Meyer knew that the Moli packs were successful. In fact, he testified that although they could perform some tasks, they were not adequate to be offered for sale with Plaintiffs' power tools. Thus, Meyer's later representations that the Moli packs were failures, even if stated strongly, were not false.

Chervon's motion boils down to a substantive disagreement with Plaintiffs about the capabilities of the Moli packs, layered atop a claim construction dispute. Such matters are not susceptible of resolution at this stage. At a minimum, these disputes belie a claim of fraud, which requires more than simply a battle of opinions over how an invention should have or could have worked. *('858) Patent Litig.*, 2014 WL 2938183, at *6 (finding that evidence might support inference of fraud or an honest mistake, but no conclusion could be drawn without further development).

These disputed facts distinguish this case from *Shelbyzyme, LLC v. Genzyme Corp.*, Civil Action No. 09–768–GMS, 2013 WL 3229964, at *1, *6

---

break at the mid-point after the pack overheated. (Docket #189-2). Chervon asserts that this test, undisclosed to the Patent Office, undermines the result of the prior cutting test. (Docket #188 at 17). Plaintiffs filed a motion for leave to file a surreply, arguing that they needed a chance to address the email. (Docket #191). The Court agrees with Plaintiffs on this point, and it will grant the motion for leave to file a surreply. *See Meraz-Camacho v. United States*, 599 F.3d 626, 631 n.2 (7th Cir. 2010). In any event, it changes nothing. Considering this email alongside the other evidence presented, the parties' obvious factual disputes about what constituted success for purposes of these tests are not amenable to resolution in the discovery context.

(D. Del. June 25, 2013), cited by Chervon, wherein the plaintiff should have known that it abandoned its patent but deliberately misrepresented the abandonment as unintentional. Similarly, this case is a far cry from *Micron*, where the Federal Circuit had the benefit of "ample evidence" of spoliation of evidence which was done on the advice of counsel. *Micron*, 645 F.3d at 1330; *see also Gen. Am. Transp. Corp. v. Cryo-Trans, Inc.*, 159 F.R.D. 543, 546 (D. Or. 1995) (application of crime-fraud exception was supported by prior issuance of a preliminary injunction—and concomitant finding of likelihood of success—on allegations of fraud on Patent Office). Here, there is no such clarity as to whether any of Meyer's statements were in fact false. *See also Nobelpharma AB v. Implant Innovations, Inc.*, 930 F. Supp. 1241, 1254 (N.D. Ill. 1996) (denying motion for new trial based on evidence introduced at trial proving that material references were knowingly concealed from the Patent Office).

In the same way, this case is unlike *Leybold-Heraeus Tech., Inc. v. Midwest Instr. Co., Inc.*, 118 F.R.D. 609, 615 (E.D. Wis. 1987), in which the plaintiff withheld from the Patent Office material prior art that had been cited and applied against a foreign counterpart application. Here, Chervon has no comparable evidence showing that Plaintiffs knew or should have known that the Moli packs were relevant to the '800 Application. Moreover, the Moli test results were fully disclosed with respect to the patents-in-suit. *See also Monon Corp. v. Stoughton Trailers, Inc.*, 169 F.R.D. 99, 102–03 (N.D. Ill. 1996) (inventor knowingly concealed existence of material prior art by affirmatively stating that none such existed); *see also* (Docket #172 at 19) (Chervon noting that "the crime-fraud

exception hinge[s] on a *prima facie* showing of deceptive intent behind the misrepresentation or omission") (citing *Unigene*, 655 F.3d at 1358–59).

In sum, while Chervon may take exception to Meyer's characterizations of the facts and the scope of the relevant patent claims, this displeasure does not establish fraud. It is Chervon's burden to persuade the Court that it is more likely than not that Plaintiffs committed fraud, and this they have not done. Rather, Chervon's actual evidence represents a "flimsy foundation" to apply the "extreme remedy" of piercing in this case. *Unigene*, 655 F.3d at 1359.

### 3. CONCLUSION

For the reasons stated above, the Court finds that the crime-fraud exception to attorney-client privilege does not apply here. Therefore, Chervon's motion to compel must be denied.

Accordingly,

**IT IS ORDERED** that Defendant Chervon North America Inc.'s motion to compel (Docket #171) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that the parties' motions for leave to file their documents under seal in connection with this motion (Docket #170, #182, #187, #190, and #197) be and the same are hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that Plaintiffs' motion for leave to file a surreply (Docket #191) be and the same is hereby **GRANTED**.

Dated at Milwaukee, Wisconsin, this 26th day of May, 2017.

BY THE COURT:

_____
J.P. Stadtmueller
U.S. District Judge